**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>           )<br>    Plaintiff, )<br>           )<br>    v. )<br>           )<br>WASTE MANAGEMENT, INC. )<br>           )<br>    and )<br>           )<br>DEFFENBAUGH DISPOSAL, INC., )<br>           )<br>    Defendants. )<br>           ) | Civil Action No.:<br><br>Description: Antitrust<br><br>Date Stamp: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the Final Judgment submitted for entry in this civil antitrust proceeding.

### I.   NATURE AND PURPOSE OF THE PROCEEDING

Pursuant to an Agreement and Plan of Merger dated September 17, 2014, Waste Management, Inc. ("WMI") proposes to acquire all of the outstanding shares of common stock of Deffenbaugh Disposal, Inc. ("DDI") in a transaction valued at approximately $405 million.

The United States filed a civil antitrust Complaint on March 13, 2015, seeking to enjoin the proposed acquisition.  The Complaint alleges that the proposed acquisition likely would substantially lessen competition for small container commercial waste

collection service in the area of Topeka, Kansas, and in two areas in Northwestern Arkansas – Van Buren/Fort Smith, and Springdale – in violation of Section 7 of the Clayton Act. This loss of competition would result in consumers paying higher prices and receiving inferior services for small container commercial waste collection service in those areas.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest specified small container commercial waste collection assets. Under the terms of the Hold Separate Stipulation and Order, WMI and DDI are required to take certain steps to ensure that the assets to be divested will be preserved and held separate from other assets and businesses.

The United States and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

II.  **DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS**

    A.  **The Defendants**

WMI is a Delaware corporation with its headquarters in Houston, Texas. WMI provides collection, transfer, recycling, and disposal services throughout the United States. In 2014, WMI had estimated total revenue of $14 billion.

DDI is a Delaware corporation, with its headquarters in Kansas City, Kansas. DDI offers collection, transfer, recycling, and disposal services in Kansas, Missouri, Arkansas, Nebraska, and Iowa. In 2013 DDI had estimated total revenue of approximately $180 million.

**B.     The Competitive Effects of the Transaction on Small Container
         Commercial Waste Collection in Topeka, Kansas, and
         Van Buren/Fort Smith and Springdale, Arkansas**

Municipal solid waste ("MSW) is solid, putrescible waste generated by households and commercial establishments. Waste collection firms, or haulers, contract to collect MSW from residential and commercial customers and transport the waste to private and public MSW disposal facilities (*e.g.*, transfer stations and landfills), which, for a fee, process and legally dispose of the waste. Small container commercial waste collection is one component of MSW collection, which also includes residential and other waste collection. WMI and DDI compete in the collection of small container commercial waste.

Small container commercial waste collection service is the collection of MSW from commercial businesses (*e.g.*, office and apartment buildings) and retail establishments (*e.g.*, stores and restaurants) for shipment to, and disposal at, an approved disposal facility. Because of the type and volume of waste generated by commercial accounts and the frequency of service required, haulers organize commercial accounts into routes, and generally use specialized equipment to store, collect, and transport MSW from these accounts to approved MSW disposal sites. This equipment (*e.g.*, one to ten-cubic-yard containers for MSW storage, and front-end load vehicles commonly used for collection and transportation of MSW) is uniquely well-suited for providing small

3

container commercial waste collection service. Providers of other types of waste collection services (*e.g.*, residential and roll-off services) are not good substitutes for small container commercial waste collection firms. In these types of waste collection efforts, firms use different waste storage equipment (*e.g.*, garbage cans or semi-stationary roll-off containers) and different vehicles (*e.g.*, rear-load, side-load, or roll-off trucks), which, for a variety of reasons, cannot be conveniently or efficiently used to store, collect, or transport MSW generated by commercial accounts and, hence, are rarely used on small container commercial waste collection routes. In the event of a small but significant increase in price for small container commercial waste collection services, customers would not switch to any other alternative. Thus, the Complaint alleges that the provision of small container commercial waste collection services constitutes a line of commerce, or relevant service, for purposes of analyzing the effects of the transaction.

The Complaint alleges that the provision of small container commercial waste collection service takes place in compact, highly-localized geographic markets. It is expensive to transport MSW long distances between collection customers or to disposal sites. To minimize transportation costs and maximize the scale, density, and efficiency of their MSW collection operations, small container commercial waste collection firms concentrate their customers and collection routes in small areas. Firms with operations concentrated in a distant area cannot effectively compete against firms whose routes and customers are locally based. Distance may significantly limit a remote firm's ability to provide commercial waste collection service as frequently or conveniently as that offered by local firms with nearby routes. Also, local small container commercial waste firms have significant cost advantages over other firms, and can profitably increase their

charges to local small container commercial waste collection customers without losing significant sales to firms outside the area.

Applying this analysis, the Complaint alleges that in the Topeka, Kansas Area, the Van Buren/Fort Smith, Arkansas Area, and the Springdale, Arkansas Area, a local small container commercial waste collection monopolist could profitably increase charges to local customers without losing significant sales to more distant competitors. Accordingly, the Topeka Area, and the Van Buren/Fort Smith and Springdale Areas of Northwest Arkansas, are sections of the country or relevant geographic markets for the purpose of assessing the competitive effects of a combination of WMI and DDI in the provision of small container commercial waste collection services.

There are significant entry barriers to small container commercial waste collection. A new entrant must achieve a minimum efficient scale and operating efficiencies comparable to those of existing firms in order to provide a significant competitive constraint on the prices charged by market incumbents. In order to obtain comparable operating efficiencies, a new firm must achieve route density similar to existing firms. However, an incumbent's ability to price discriminate and to enter into long-term contracts with existing small container commercial waste customers can leave too few customers available to the entrant to create an efficient route in a sufficiently confined geographic area. An incumbent firm can selectively and temporarily charge an unbeatably low price to specified customers targeted by new entrants. Because of these factors, a new entrant may find it difficult to compete by offering its services at pre-entry price levels comparable to the incumbent and may find an increase in the cost and time

required to form an efficient route, thereby limiting a new entrant's ability to build an efficient route and reducing the likelihood that the entrant will ultimately succeed.

The need for route density and the ability of existing firms to price discriminate raise significant barriers to entry by new firms, which likely will be forced to compete at lower than pre-entry price levels.  Based on the prior experience of the Department of Justice, Antitrust Division, such barriers have made entry and expansion difficult by new or smaller-sized competitors in small container commercial waste collection markets.

In the Topeka, Kansas and the Van Buren/Fort Smith, Arkansas Areas, the proposed acquisition would reduce from three to two the number of significant competitors in the collection of small container commercial waste.  Moreover, in Topeka, for many of the largest small container commercial waste customers WMI and DDI are currently the only two options.  These customers would be left with only one option as a result of the acquisition.

In the Springdale, Arkansas Area, the proposed acquisition would reduce the number of competitors in the collection of small container commercial waste from four to three.  Moreover, in both areas in Arkansas, DDI is often the low-price leader, and customers in these areas frequently switch between existing competitors in order to take advantage of lower prices.  In addition, in both of the areas in Arkansas, WMI and DDI are among the few small container commercial waste firms that can reliably service larger accounts.

In all three markets, according to the defendants' estimates, after the acquisition the combined WMI-DDI entity would service between 64 and 67% of each market.

The complaint alleges that the combination of WMI and DDI in those areas would remove a significant competitor for small container commercial waste service. In each of these markets, the resulting increase in concentration, loss of competition, and absence of any reasonable prospect of new entry by smaller competitors likely will result in higher prices and reduced quality of small container commercial waste service.

### III.     EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in small container commercial waste collection service in the Topeka, Kansas Area, the Van Buren/Fort Smith, Arkansas Area, and the Springdale, Arkansas Area. The proposed Final Judgment will remove small container commercial waste collection assets from the merged firm's control and place them in the hands of one or more independent firms that are capable of preserving the competition that otherwise would have been lost as a result of the acquisition.

The proposed Final Judgment requires defendants, within ninety days after the filing of the Complaint, or five days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest: small container commercial waste collection assets (routes, trucks, containers, garages and offices, leasehold rights, permits, and intangible assets such as customer lists and contracts) in the Topeka, Kansas Area, the Van Buren/Fort Smith, Arkansas Area, and the Springdale, Arkansas Area. To eliminate the anticompetitive effects of the acquisition in the market for small container commercial waste in the Topeka Area, defendants must divest DDI's small container commercial waste routes T501, T502, T503, and T504, and, at the acquirer's option, DDI's Topeka small container commercial waste collection facility. In the Van Buren/Fort Smith Area,

defendants must divest DDI's small container commercial waste routes V501 and V502, and, at the acquirer's option, assign or offer to sublease DDI's Van Buren small container commercial waste collection facility.  In the Springdale Area, defendants must divest DDI's small container commercial waste routes B501, B502, B503, B504, and B505, and, at the acquirer's option, must lease to the acquirer for up to 10 years (length at the election of the acquirer) DDI's Bethel Heights small container commercial waste collection facility, or WMI's Springdale small container commercial waste collection facility.

In addition, in the Springdale market, the proposed Final Judgment requires WMI to enter into a disposal agreement providing the acquirer with the right to dispose of MSW at its Eco Vista landfill in Springdale, Arkansas.  The disposal agreement must be for a period of no less than three years from the date of the divestiture, with the acquirer(s) of the divestiture assets having the option of seven one-year renewals, under reasonable terms.  The disposal agreement shall also provide the acquirer access to gates, side houses, and disposal areas under terms and conditions that are no less favorable than provided to WMI's own vehicles.  WMI and the acquirer shall negotiate the price for disposal rights and access to the Eco Visa landfill subject to approval of the United States.  This provision is intended to prevent WMI from using its acquisition of DDI and DDI's nearby transfer station as a means to prevent the acquirer of DDI's divested routes from establishing itself in the Springdale market due to an inability to find an economically viable location to dispose of MSW collected in this market.

The proposed Final Judgment provides that sale of the divestiture assets may be made to one or more acquirers, so long as the Topeka, Kansas Area, the Van Buren/Fort

Smith, Arkansas Area and the Springdale, Arkansas Area disposal assets are divested to a single acquirer for each area.  This provision is intended to ensure the continued operation of an efficient competitor whose participation in each market will closely replicate the competition existing prior to the acquisition.

The assets must be divested to purchasers approved by the United States and in such a way as to satisfy the United States that they can and will be operated by the purchaser as part of a viable, ongoing business or businesses that can compete effectively in each relevant market.  Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

In the event that defendants do not accomplish the divestitures within the period prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestitures.  If a trustee is appointed, the proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee.  The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished.  After the trustee's appointment becomes effective, the trustee will file monthly reports with the Court and the United States, setting forth the trustee's efforts to accomplish the divestitures.  At the end of six months, if the divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time

prior to the Court's entry of judgment.  The comments and the response of the United States will be filed with the Court.  In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website, and, under certain circumstances, published in the Federal Register.  Written comments should be submitted to:

> James J. Tierney
> Chief, Networks and Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 7700
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.     ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions preventing WMI's acquisition of DDI.  The United States is satisfied, however, that the divestiture of the assets described in the proposed Final Judgment will preserve competition for small container commercial waste collection service in the Topeka, Kansas Area, the Van Buren/Fort Smith, Arkansas Area, and the Springdale, Arkansas Area.  Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v, U.S. Airways Group, Inc.*, No. 13-cv-1236 (CKK), 2014-1 Trade Cas. (CCH) ¶ 78, 748, 2014 U.S. Dist. LEXIS 57801, at *7

(D.D.C. Apr. 25, 2014) (noting the court has broad discretion of the adequacy of the relief at issue); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3, (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable.").[1]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

13

> Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp.

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *8 (noting that room must be made for the government to grant concessions in the negotiation process for settlements (citing *Microsoft*, 56 F.3d at 1461); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *9 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable; *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest

determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *9 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3] A court can make its public interest

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

determination based on the competitive impact statement and response to public comments alone.  *U.S. Airways*, 2014 U.S. Dist. LEXIS  57801, at *9.

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated:  March 13, 2015

                                                              Respectfully submitted,

                                          _____ /s/ _____

                                          Ian D. Hoffman
                                          U.S. Department of Justice
                                          Antitrust Division, *Networks and Technology Enforcement Section*
                                          450 Fifth Street, N.W., Suite 7644
                                          Washington, D.C. 20530
                                          (202) 598-2456
                                          ian.hoffman@usdoj.gov